# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | Chapter 11 |
| | : | |
| AH LIQUIDATION, INC., | : | Case No. 21-10883 (CTG) |
| | : | |
| Debtor. | : | (Jointly Administered) |
| ──────────────────────────── | : | |
| | : | |
| HE, INC., | : | |
| Appellant, | : | |
| v. | : | Civ. No. 23-329-JLH |
| | : | |
| AVADIM HOLDINGS INC., and | : | |
| RELION HOLDINGS LLC, | : | |
| | : | |
| Appellees. | : | |

Thomas G. Macauley, Macauley LLC, Wilmington, DE

    *Counsel for Appellant HE, Inc.*

David M. Griffiths, Rachel L. Foust, Weil Gotshal & Manges LLP, New York, NY; Paul N. Heath, Zachary I. Shapiro, Corey D. Kandestin, Robert C. Maddox, Alexander R. Steiger, Richards Layton & Finger, P.A., Wilmington, DE

    *Counsel for Appellees Avadim Holdings, Inc. and Relion Holdings LLC*

**OPINION**

February 12, 2025

**HALL, U.S. DISTRICT JUDGE**

I.   **INTRODUCTION**

This appeal arises from the chapter 11 cases of the above-captioned debtors ("Debtors") in connection with the Bankruptcy Court's construction and enforcement of its order (A-077–A-115)[1] ("Sale Order") approving the sale of the Debtors' assets to appellees Avadim Holdings, Inc. and Relion Holdings LLC ("Buyer"). Prior to their bankruptcy, the Debtors bought from appellant HE, Inc. ("HE") U.S. Patent No. 6,358,516 (the "Patent"), as well as all of the intellectual property associated with the Patent that was not already included in the Patent (the "Proprietary Technical Information" or "PTI," and together with the Patent, the "Patent IP"). When the Debtors filed for bankruptcy, the Patent IP became property of the estate. The Debtors then sold substantially all of their assets to the Buyer, including all of their intellectual property. The Sale Order approved this sale free and clear of any claims or encumbrances. One year later, HE sued the Buyer in the Southern District of Georgia for using the Patent IP. Buyer moved the Bankruptcy Court to enforce the Sale Order and determine that the Buyer owned the Patent IP free and clear of HE's lawsuit. On March 9, 2023, the Bankruptcy Court entered an order (B.D.I. 555)[2] ("Enforcement Order") enforcing the Sale Order, and HE has appealed. For the reasons set forth below, the Court will affirm the Enforcement Order.

II.   **BACKGROUND**

   A.   **Pre-Bankruptcy Transfer of the Patent IP**

In 2002, HE obtained the Patent. A-336. Referred to as the "One-Step System for

---

[1] The appendix (D.I. 8-1) to HE's opening brief is cited herein as "A-_," and the appendix (D.I. 10) to Buyer's answering brief is cited herein as "SA-_."

[2] The docket of the chapter 11 cases, captioned *In re AH Liquidation, Inc.*, No. 21-10883 (CTG) (Bankr. D. Del.), is cited herein as "B.D.I. __."

1

Cleansing, Conditioning, and Treating the Skin," the Patent relates to a wet wipe product used to clean the skin of patients in a hospital setting in lieu of other bathing methods such as a wash basin. A-28 (First Whereas Clause); B.D.I. 547 ("1/19/23 Hr'g Tr." at 7:21-23). In 2007, HE licensed the Patent to the Debtors.[3] A-28 (Settlement Agreement at Second Whereas Clause). Then in 2013, HE outright sold the Patent to the Debtors. A-28 (Settlement Agreement at Fourth Whereas Clause).

Three years later, following a series of disputes, the Debtors and HE entered into three contracts: (1) a Settlement Agreement, dated July 15, 2016 (A-28–A-50) (the "Settlement Agreement"); (2) a Confidentiality Non-Use and Non-Disclosure Agreement, dated July 15, 2016 (A-52–A-67) (the "Confidentiality Agreement"); and (3) the Assignments and Confirmation of Previous Assignments, dated July 18, 2016 (A-69–A-75) (the "Assignment").

### 1. The Settlement Agreement

The Settlement Agreement superseded all prior agreements and became the operative agreement governing the Debtors' and HE's relationship. *See* A-29 (Settlement Agreement at Ninth Whereas Clause) (reciting that the parties entered into the Settlement Agreement to "successfully conclude their business dealings in accord and satisfaction, substituting this Settlement Agreement for the Prior Agreements").

The Settlement Agreement reaffirmed the sale and transfer to the Debtors of HE's "entire right, title, and interest in and to" the Patent, and further conveyed to the Debtors all of the Patent IP. A-28 (Settlement Agreement at Fourth Whereas Clause). HE thus broadly assigned to the Debtors everything it owned associated with topically applied formulations, "including, but not limited to, **patents**, trademarks, copyrights, domain names, web addresses, websites, personal

---

[3] The party at the time was the predecessor to the Debtors, Avadim, LLC. For ease of reference, I refer to the Debtors and their predecessors collectively as "the Debtors."

sales, equipment, *and proprietary business and technical information* … reasonably related to topically applied formulations that may be used on people, other mammals, surfaces, and the like." A-29 (Settlement Agreement § 1) (emphasis added).[4] HE also relinquished all rights in the Patent IP:

> Neither HE, Inc. nor N.R. Harod shall retain any rights whatsoever in the assets of HE, Inc. that are assigned under this Section 1 … or any rights or ownership whatsoever in the subject matter of this Settlement Agreement.

A-29 (Settlement Agreement § 1); *see also* A-30 (Settlement Agreement § 1) (HE "retain[s] no ownership interest whatsoever in any subject matter reasonably related to topically applied formulations[.]"); A-33 (Settlement Agreement § 10) ("[T]he parties confirm that HE, Inc. has retained under this Settlement Agreement ownership of no rights or property whatsoever, other than with respect to any liabilities associated therewith, in any subject matter reasonably related to topically applied formulations[.]").

In exchange, the Debtors agreed to pay consideration to HE, including cash in monthly installments. A-32–A-33 (Settlement Agreement § 9(b)). The Settlement Agreement provided that if the Debtors breached this obligation, the breach would "not result in termination of this Settlement Agreement, and the sole remedy of HE, Inc. and N.R. Harod [would] be in monetary damages." A-38 (Settlement Agreement § 23).

### 2. The Confidentiality Agreement

The Debtors and HE also entered into the Confidentiality Agreement. Under that agreement, HE and its principals agreed not to disclose any confidential information, trade secrets,

---

[4] HE did not sell any "Excluded Assets," which was defined as securities, cash, and assets unrelated to the Patent IP. A-30 (Settlement Agreement § 1) (assets "not associated directly or indirectly with assets reasonably related to topically applied formulations … (including, without limitation, U.S. Patent No. 6,358,516)").

3

or other proprietary information relating to the Patent IP—that is, "relating to topically applied formulations that may be used on people, other mammals, surfaces, and the like, including but not limited to formulations coming within the scope of … U.S. Patent No. 6,358,516, and that may not be specifically enumerated in U.S. Patent No. 6,358,516." A-53 (Confidentiality Agreement § 1). The Confidentiality Agreement signatories also transferred to the Debtors "all ownership interest that any of them may possess, individually or collectively with HE, Inc., in the HE, Inc. Proprietary Information [and] . . . acknowledge[d] that none of them . . . retain[] any interest whatsoever in the HE, Inc. Proprietary Information" going forward. A-54 (Confidentiality Agreement § 4).

### 3. The Assignment

Finally, HE formally transferred the Patent IP by executing the Assignment. The Assignment relates to both the Patent and the Proprietary Technical Information, which the Assignment defines as:

> proprietary technical information associated with the said Harod U.S. Patent No. 6,358,516, including inventions, trade secrets, and the like information reasonably related to topically applied formulations that may be used on people, mammals, surfaces, and the like ("Proprietary Technical Information")[.]

A-69 (Second Whereas Clause). The Assignment then confirmed the transfer of the Patent, and conveyed the Proprietary Technical Information, from HE to the Debtors:

> HE, Inc. has sold to Avadim LLC and by these presents does hereby confirm the sale, assignment, transference, and conveyance unto Avadim LLC as of March 4, 2013; and Avadim LLC has sold to ATI … ***the entire right, title, and interest, including the right to sue for past infringement, in Harod U.S. Patent No. 6,358,516…***
>
> The Parties further wish it known that for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Harod and HE, Inc., jointly and severally, have sold and by these presents do hereby confirm the sale, assignment, transference, and conveyance unto ATI, ***the entire right, title, and***

4

>                *interest in the Proprietary Technical Information[.]*

A-70–A-71 (emphasis added).

### B.  The Chapter 11 Cases

The Debtors filed for bankruptcy in May 2021.  On August 1, 2021, the Bankruptcy Court entered the Sale Order approving the APA.  A-77.  Under the APA, the Buyer bought the "Purchased Assets."  A-139 (APA § 2.1).  The term "Purchased Assets" was defined as all of the Debtors' assets not specifically listed as an Excluded Asset.  A-135 (APA § 1.1) (definition of "Purchased Assets").  The Purchased Assets included all the Debtors' "Owned Intellectual Property," which was defined as "all Intellectual Property owned … by a Seller."  A-141 (APA § 2.1(p)); A-138 (APA § 1.1).  The "Owned Intellectual Property" included, but was not limited to, the intellectual property listed on Schedule 4.9(a) of the APA.  A-141 (APA § 2.1(p)); A-154 (APA § 4.9) ("Owned Intellectual Property" included "Scheduled Intellectual Property," which was defined as the intellectual property listed on Schedule 4.9(a)).  In turn, Schedule 4.9(a) contained a list of patents, including the Patent.  A-294 (Schedule 4.9(a)).

In sum, the Debtors sold all of their assets, including all of their intellectual property, unless specifically excluded.  The Patent IP was not specifically excluded and, therefore, was a Purchased Asset.[5]  The Sale Order approved the transfer of Purchased Assets to the Buyer free and clear of any claims and encumbrances.  A-98 (Sale Order ¶ 16).  Specifically, the Sale Order provided that "no holder of any Claims or Encumbrances in the Purchased Assets shall interfere with the Buyer's enjoyment of the Purchased Assets based on or related to such Claim[.]"  *Id*.  To enforce this provision, the Sale Order enjoined persons holding any claim against the Debtors or the Purchased Assets from asserting that claim against the Buyer.  A-107 (Sale Order ¶ 35)

---

[5] Section 2.2 of the APA lists the "Excluded Assets" and does not list the Patent IP.  A-141–A-142.

5

(providing that all persons having any claims "against, in, or with respect to … the Purchased Assets" are "forever barred and estopped from asserting, prosecuting, or otherwise pursuing such Claim … against the Buyer or any affiliates, successors or assigns thereof … with respect to the Purchased Assets").

At the request of HE, the parties agreed to include language in the Sale Order confirming that the Debtors were not assuming the Settlement Agreement or Confidentiality Agreement, or assigning rights or obligations under those agreements to the Buyer:

> Neither the Settlement Agreement … nor the [Confidentiality Agreement] shall be an Assumed Contract. Further, notwithstanding anything to the contrary in this Order or the Stalking Horse APA, none of the Debtors' rights or obligations under the [Settlement Agreement] and the [Confidentiality Agreement] shall transfer to the Buyer.

A-111 (Sale Order ¶ 44). The Sale Order defines "Assumed Contracts" as "executory contracts and unexpired leases of the Debtors that will be assumed and assigned to the Buyer." A-078; A-125 (APA §§ 1.1, 2.5).

On November 5, 2021, the Debtors confirmed their plan (the "Plan"), which became effective ten days later. The Plan provides that all executory contracts not expressly assumed as of the effective date are rejected. SA-97 (Plan § XI.B). The Debtors never assumed the Settlement Agreement or Confidentiality Agreement, and those contracts therefore were rejected on the Plan's effective date. The Assignment was not executory as it was substantially completed upon the assignment of the Patent IP, and thus there were no material unperformed obligations remaining.

### C. HE's Post-Sale Suit Against the Buyer

In November 2022, HE sued the Buyer and its affiliate in the U.S. District Court for the Southern District of Georgia. A-326–A-375 (the "Complaint"). HE alleged that under paragraph

44 of the Sale Order, the Buyer "purposefully failed to purchase the intellectual property rights of HE, Inc. in the Bankruptcy Action," and therefore, "the proprietary information reverted back to HE, Inc." Complaint ¶¶ 10, 23. Based on this view that the Proprietary Technical Information "reverted back to HE," HE sought damages and an injunction against the Buyer for its "unauthorized use" of the Proprietary Technical Information. *Id.* ¶ 1.

### D.    Enforcement Order

On December 23, 2022, the Buyer filed a motion in the Bankruptcy Court to enforce the Sale Order against HE (A-8–A-26) (the "Motion to Enforce"). The Motion to Enforce sought a ruling that HE's Complaint violated the Sale Order's free and clear provisions and that the Buyer owned the Patent IP free and clear of all claims, including any claims of HE. A-17. HE admitted that it had sold the Patent to the Debtors in 2013. A-382 (HE Objection ¶ 31 n.6) ("HE had previously transferred the Patent to the Debtors pursuant to the 2013 Patent Agreement."). HE further acknowledged that its reading of paragraph 44 of the Sale Order did not apply to the Patent (rather than the Proprietary Technical Information). A-382 (HE Objection ¶ 31 & n.6) ("Paragraph 44 of the Sale Order should not apply to the Patent."). Thus, the only asset at issue was the Proprietary Technical Information. HE further acknowledged that it had conveyed ownership of the Proprietary Technical Information to the Debtors in 2016. A-379 (HE Objection ¶ 13) (the Assignment "provides for the assignment of the PTI by HE to the Debtors[.]"); 1/19/23 Hr'g Tr. at 31:21-24 ("THE COURT: So[,] the PTI, everyone agrees that after the three 2016 agreements are entered into, the PTI is owned by the Debtor, right? That's common ground. MR. MACAULEY: Right."). Finally, HE acknowledged that but for its reading of paragraph 44 of the Sale Order, the Proprietary Technical Information was a "Purchased Asset" under the APA. *Id.* at 31:25-32:6 ("THE COURT: And the sale agreement itself, is your position that the sale agreement excluded the PTI from the conveyed assets? … MR. MACAULEY: No.").

7

Rather, HE contended that the final sentence of Sale Order paragraph 44 removed the PTI from the APA's definition of "Purchased Assets." *Id*. at 32:8-11 ("THE COURT: So[,] it's really just about paragraph 44? MR. MACAULEY: Yeah. That language trumps the sale….") Thus, the question before the Bankruptcy Court was whether paragraph 44 of the Sale Order removed the Proprietary Technical Information from the assets that the Buyer bought and, in HE's words, caused ownership rights to "revert back to HE." Complaint ¶ 23.

The Bankruptcy Court received full briefing on this issue, took evidence, and heard oral argument. B.D.I. 534, 535 & 536; A-410–A-456. On the record before it, the Bankruptcy Court ruled that paragraph 44 of the Sale Order did not remove the Proprietary Technical Information from the asset sale. Rather, the Bankruptcy Court ruled that "the PTI that was owned by the Debtor was transferred free and clear to the buyer in connection with the sales transaction that this Court previously approved." 1/19/23 Hr'g Tr. at 47:22-25.[6]

In reaching this ruling, the Bankruptcy Court specifically considered the language of paragraph 44 of the Sale Order and the parties' respective readings of that language. *Id*. at 51:3-52:16. The Bankruptcy Court found that the Buyer's reading was "the more sensible reading in this context." *Id*. at 52:4-5. It also concluded that HE's reading of paragraph 44 of the Sale Order as "giving back essentially to the seller assets that it had transferred to the buyer under those agreements … just isn't a sensible way to make sense of what that language was trying to do." *Id*. at 52:5-11.

The Bankruptcy Court then entered an order (B.D.I. 545) enforcing the Sale Order, paragraph 4 of which memorializes the Court's construction of Sale Order ¶ 44:

---

[6] The Bankruptcy Court also denied HE's cross-motion to abstain to allow the non-bankruptcy court in which it filed its complaint to construe the Bankruptcy Court's Sale Order. Although HE asserts that if this Court reverses, the Bankruptcy Court should then abstain (D.I. 8 at 19 n.18), HE has not appealed that denial.

> Pursuant to the Sale Order, the Buyer owns the Patent IP free and clear of all claims and encumbrances, including any claims of HE. HE retains no rights in any of the assets that Buyer purchased pursuant to the Sale Order, including the Patent IP. This Court construes the last sentence of ¶ 44 of the Sale Order to clarify (consistent with the prior sentence) that HE shall not owe future performance obligations to the Buyer under the [Settlement Agreement and Confidentiality Agreement]. That sentence does not operate to revoke any conveyance of an asset that had already occurred as of the entry of the Sale Order.

*Id.* ¶ 4. HE moved the Bankruptcy Court to reconsider or amend its order and proposed suggested language to add to the order. B.D.I. 548. The Bankruptcy Court denied the request to reconsider its ruling and declined to add HE's proposed language to the order. The Bankruptcy Court instead added a new paragraph 4.a to the order expressing no view on whether the Buyer could sue HE, on account of the Buyer's free and clear ownership of the Patent IP, if HE ever attempted to exploit that IP. Enforcement Order ¶ 4a. The Bankruptcy Court also added language providing that the Buyer held no greater rights in the Patent IP than the Debtors did before the sale—a proposition that the Buyer has never disputed. *Id.*

      E.      **The Appeal**

On March 23, 2023, HE filed its Notice of Appeal with respect to the Enforcement Order. D.I. 1. The merits of the appeal are fully briefed. D.I. 8, 9, 12. This matter was assigned to me on January 12, 2024. No party requested oral argument.

**III.**      **JURISDICTION AND STANDARD OF REVIEW**

Appeals from the Bankruptcy Court to this Court are governed by 28 U.S.C. § 158. District courts have mandatory jurisdiction to hear appeals "from final judgments, orders, and decrees." 28 U.S.C. § 158(a)(1). The Bankruptcy Court's Sale Order authorizing sale of the Debtors' property is a final, appealable order. *In re Culp,* 550 B.R. 683, 691 (D. Del. 2015). The Enforcement Order, which enforces the Sale Order and "dispose[s] of [a] discrete dispute[] within

9

the larger case," is also final and appealable. *In re Energy Future Holdings Corp.,* 904 F.3d 298, 308 (3d Cir. 2018) (quoting *Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 657 n.3 (2006)).

"When a bankruptcy court has analyzed one of its own orders, 'an appellate court must distinguish between the review of a bankruptcy court's application of legal principles and the review of a bankruptcy court's actual interpretation of an ambiguous provision in its own order.'" *In re LTC Holdings, Inc.*, 10 F.4th 177, 184 (3d Cir. 2021) (quoting *In re Shenango Grp. Inc.*, 501 F.3d 338, 346 (3d Cir. 2007)). The application of legal principles to an unambiguous provision is reviewed *de novo*, whereas the interpretation of an ambiguous provision is reviewed for abuse of discretion. *Id.* "The initial determination of whether a provision is ambiguous is reviewed *de novo*." *Id.*

## IV.    ANALYSIS

### A.    The Debtors Owned the Patent IP and Sold It to the Buyer Free and Clear

HE acknowledges that the Debtors owned the Patent IP when they filed for bankruptcy. *See* A-379 (HE Objection ¶ 13); 1/19/23 Hr'g Tr. at 31:21-24. Indeed, HE disclaimed any further right or interest in the Patent IP:

> The parties hereby intend to resolve ambiguity, if any, about the scope of this Settlement Agreement by stating affirmatively that it is their intention, jointly and severally, that ***HE, Inc. or N.R. Harod, jointly and individually, retain no ownership interest whatsoever in any subject matter reasonably related to topically applied formulations*** that may be used on people, other mammals, surfaces, and the like[.]

A-30 (Settlement Agreement § 1) (emphasis added).

> For clarity, and consistent with the ultimate sentence of Clause 1 of this Settlement Agreement, ***the parties affirm that HE, Inc. has retained under this Settlement Agreement ownership of no rights or property whatsoever, other than with respect to any liabilities associated therewith, in any subject matter reasonably related to***

> *topically applied formulations* that may be used on people, other
> mammals, surfaces, and the like, and that this Settlement Agreement
> shall operate to definitively and irrevocably transfer all such rights
> or property, including those, if any, retained by HE, Inc. by virtue of
> any Prior Agreements.

A-33 (Settlement Agreement § 10) (emphasis added). HE further acknowledged that the Patent IP falls within the APA's definition of "Purchased Assets." 1/19/23 Hr'g Tr. at 31:25-32:6. The Debtors sold to the Buyer all the intellectual property they owned, including the Patent IP. Finally, this sale was free and clear of all claims and encumbrances. A-97–A-98. The Sale Order prohibits all parties, including HE, from interfering with the Buyer's rights in the Patent IP.

In sum, there appears no dispute that, as of the bankruptcy filing, the Debtors owned the Patent IP, the Debtors sold the Patent IP to the Buyer, and the sale was free and clear of any claims and encumbrances. But for HE's reading of Sale Order paragraph 44, there is no dispute that the Buyer owns the Patent IP free and clear.

  **B. The Language at Issue Is Unambiguous**

HE's sole basis for asserting that the Buyer did not buy the Patent IP from the Debtors was its reading of Sale Order paragraph 44. Paragraph 44 states:

> Neither the Settlement Agreement … nor the [Confidentiality
> Agreement] shall be an Assumed Contract. Further,
> notwithstanding anything to the contrary in this Order or the
> Stalking Horse APA, none of the Debtors' rights or obligations
> under the [Settlement Agreement] and the [Confidentiality
> Agreement] shall transfer to the Buyer.

A111 (Sale Order ¶ 44). HE argues that "as a result of the Second Sentence, the Buyer has no rights to the PTI." D.I. 12 at 1.

As an initial matter, this Court reviews *de novo* "whether a provision is ambiguous." *In re LTC Holdings*, 10 F.4th at 184. HE argues in its opening brief that the Bankruptcy Court "believed that the Second Sentence is ambiguous." D.I. 8 at 12. Buyer responds that the "Bankruptcy Court

11

never so held." D.I. 9 at 26 n.8. During oral argument, the Bankruptcy Court observed, "I appreciate that this language is reasonably amenable to more than one construction." 1/19/23 H'rg Tr. at 41:24-42:3. Ambiguity exists when contractual provisions "are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *In re Dura Automotive Sys.*, 2010 WL 180249, *3 (D. Del. Jan. 19, 2010). But neither party argued below—nor do they argue on appeal—that paragraph 44 was ambiguous. 1/19/23 H'rg Tr. at 42:4-6; *id*. at 44:7-13. Whether the language was ambiguous was not part of the Bankruptcy Court's ultimate holding. HE argues that because "the parties have not argued that the Second Sentence is ambiguous, this Court's standard of review is *de novo*." D.I. 12 at 1.

The Court agrees that Paragraph 44 is unambiguous.[7] Reviewing the ruling *de novo*, the Bankruptcy Court's application of legal principles to the construction is correct. The first sentence of paragraph 44 states that the specified contracts will not be "Assumed Contracts," that is, "executory contracts and unexpired leases of the Debtors that will be assumed and assigned to the Buyer." A-078; A-135 (APA § 1.1) (definition of "Purchased Assets"). The second sentence of paragraph 44 states that, notwithstanding anything to the contrary elsewhere, none of the Debtors' rights or obligations under those contracts will transfer to the Buyer. This sentence builds on the first by specifying the consequence of not assuming and assigning: the Buyer does not receive assignment of the unperformed rights, nor assumes the burden of satisfying unperformed obligations. This is because assumption or rejection of a contract relate only to those parts of the contract that are executory—that is, materially unperformed. *See Delightful Music Ltd. v. Taylor*

---

[7] Even assuming paragraph 44 is ambiguous, the outcome here is the same. A reviewing court will defer to a bankruptcy court's interpretation of its own ambiguous order unless that interpretation is unreasonable. *In re Shenango Grp*., 501 F.3d at 346 (when construing an ambiguous order, "we will defer to the Bankruptcy Court's interpretation unless it is unreasonable under the circumstances"). For the reasons set forth herein, the Bankruptcy Court's interpretation is not unreasonable.

*(In re Taylor)*, 913 F.2d 102, 106 (3d Cir. 1990) ("[T]he issue of affirmance or rejection relates only to those aspects of the contract which remained unfulfilled as of the date the petition was filed."). In other words, "[t]he decision [to assume] is forward looking, and does not affect the rights and obligations that have already accrued." *Empire State Bldg. Co. v. N.Y. Skyline, Inc. (In re N.Y. Skyline, Inc.),* 432 B.R. 66, 80 (Bankr. S.D.N.Y. 2010).

Accordingly, the Bankruptcy Court did not err when it construed paragraph 44's second sentence to "clarify (consistent with the prior sentence) that HE shall not owe future performance obligations to the Buyer" under the specified agreements. Enforcement Order ¶ 4. For the same reason, the language "does not operate to revoke any conveyance of an asset that had already occurred as of the entry of the Sale Order." *Id*.

HE argues that the phrase "notwithstanding anything to the contrary" means that "the language of the Second Sentence overrides any contrary provisions in the Stalking Horse APA or the Sale Order." D.I. 8 at 18. "For that introductory phrase to have meaning," HE asserts, "the Second Sentence must potentially conflict with the provisions in the Stalking Horse APA or the Sale Order." *Id.* at 19. As construed by HE, "the Second Sentence would conflict with the Stalking Horse APA's broad definition of "Purchased Assets" to the extent that it pertains to the PTI." *Id.* "As construed by the Bankruptcy Court as a mere clarification of the First Sentence," HE argues, "the Second Sentence does not conflict with any other provisions of the Sale Order or the Stalking Horse APA. Accordingly, this Court should construe 'rights and obligations' in the Second Sentence as HE proposes so that each provision in Paragraph 44 of the Sale Order has meaning." *Id.*

The Court disagrees. The phrase "notwithstanding anything to the contrary" expresses an intent to control over any other conflicting provision. *See, e.g., Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993) ("[T]he use of such a 'notwithstanding' clause clearly signals the drafter's

13

intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section."). The phrase does not mean that there necessarily is a conflicting provision. It simply means that one provision controls over others if a conflict arises.

### C. The Patent IP Was Not a "Right" Under the Settlement Agreement or Confidentiality Agreement

HE's primary argument on appeal is that the second sentence of Paragraph 44 of the Sale Order—"notwithstanding anything to the contrary in this Order or the Stalking Horse APA, none of the Debtors' rights or obligations under the [Settlement Agreement] and the [Confidentiality Agreement] shall transfer to the Buyer"—unambiguously prevented the transfer of the PTI to the Buyer. *See* D.I. 8 at 11-13. According to HE, the second sentence "contains no hint that 'rights and obligations' mean go-forward rights and obligations only," and "the Bankruptcy Court's inclusion of a limitation not found in the text … renders [its] interpretation untenable." *Id*. at 12-13. According to HE, the Bankruptcy Court wrongly "engrafted" the concept of executory contracts onto the second sentence of paragraph 44. *Id.* at 14. HE contends that the second sentence really refers to "the entire bundle of rights and obligations under the contract." *See id.*

HE's strained reading depends upon the premise that the Debtors' ownership of the Patent IP was a "right or obligation" under the Settlement Agreement or Confidentiality Agreement, such that by not assuming and assigning those contracts to the Buyer, the Debtors also were removing the Patent IP from the sale. This premise is incorrect. The Patent IP was not a "right" under the Settlement Agreement or Confidentiality Agreement; it was property that the Debtors owned outright. The Settlement Agreement was not a license. The Debtors' interest in the Patent IP came from owning title to that property, not from holding a contractual right to use the property. Because the Debtors' ownership of the Patent IP was not a contract right, it was not affected by paragraph 44. That paragraph does not mention the Assignment that transferred the Patent IP to

14

the Debtors. Instead, paragraph 44 addressed whether the Settlement Agreement and Confidentiality Agreement would be assumed and assigned as executory contracts. Assumption or rejection of a contract relates only to the unperformed portions of the contract and does not revoke completed transfers.[8]

Because the Debtors did not assume the Settlement Agreement and Confidentiality Agreement, they were rejected by the Plan. Like assumption, rejection affects only executory obligations. *See Taylor*, 913 F.2d at 106 ("[R]ejection relates only to those aspects of the contract which remained unfulfilled as of the date the petition was filed."). Rejection is a breach of contract as of the petition date, not a rescission. *See Mission Prod. Holdings, Inc. v. Tempnology, LLC,* 139 S.Ct. 1652, 1661 (2019) ("Rejection of a contract—any contract—in bankruptcy operates not as a rescission but as a breach."). By rejecting the Settlement Agreement and Confidentiality Agreement, the Debtors were not unwinding those contracts, or otherwise revoking transfers that had long been completed under those contracts. *See Williams v. Tomer (In re Tomer)*, 128 B.R. 746, 756 (Bankr. S.D. Ill. 1991), *aff'd* 147 B.R. 461 (S.D. Ill. 1992) ("[T]he executed portions of the contracts remain intact, and property rights acquired under the contracts prior to filing became property of the estate despite the trustee's rejection of unperformed obligations of the contracts.").

Paragraph 44 of the Sale Order did not remove the Patent IP from the sale or cause ownership

---

[8] As Buyer correctly points out, even assuming that HE's interpretation of paragraph 44 were correct, then the Patent IP would belong to the Debtors' estates, not to HE. Anything that the Debtors did not sell to the Buyer vested in the liquidating trust established under the Debtors' Plan. SA-7–SA-8 (Confirmation Order ¶ 12) ("the Liquidating Trust Assets … shall vest in the Liquidating Trust free and clear of all Claims, interests, liens, encumbrances, charges, liabilities, and other interests[.]"); SA-40 (Plan § V.A) ("Liquidating Trust Assets" include "any other remaining Assets of the Estates that are not Purchased Assets[.]"). And the liquidating trust does not claim an interest in the Patent IP. Its counsel attended the hearings before the Bankruptcy Court and permitted Buyer's counsel to represent that the liquidating trust claimed no interest in the property. A-416 (1/29/23 Hr'g Tr. at 7:3-4).

to somehow "revert back" to HE. Accordingly, the Bankruptcy Court did not err in construing paragraph 44 of the Sale Order as not affecting the Buyer's purchase of the Patent IP free and clear.

### D.     HE's Consent Judgment Argument Is Unavailing

Finally, HE challenges the Bankruptcy Court's construction of the second sentence of paragraph 44—in its view, "the more sensible reading in this context"—based on the Bankruptcy Court's observation that "courts are typically afforded substantial deference in construing their own orders." 1/19/23 Hr'g Tr. at 52. Because "Paragraph 44 was language agreed between the parties and not addressed to the Bankruptcy Court," HE argues, "the Bankruptcy Court should have strictly interpreted the language, as it would a consent judgment." D.I. 8 at 10. Conversely, the Buyer asserts that "the Court should not even consider this argument because HE did not properly raise it below." D.I. 9 at 24. The Buyer argues that HE raised a version of this argument for the first time in its motion to amend (B.D.I. 548 at 4 n.4) and a party may not raise new issues in a motion for reconsideration. *See Brambles USA, Inc. v. Blocker*, 735 F. Supp. 1239, 1240 (D. Del. 1990) (reconsideration may not be used "to argue new facts or issues that inexcusably were not presented to the court in the matter previously decided"). HE asserts that it argued for application of contractual interpretation rules prior to the initial hearing before the Bankruptcy Court. D.I. 12 at 4 (citing A-383–A-384).

Assuming HE properly raised this argument, it does not change the outcome. HE merely asserts that consent judgments are construed under principles of contract interpretation. "For the purposes of enforcement, a consent judgment is to be interpreted as a contract, to which the governing rules of contract interpretation apply." D.I. 8 at 11 (quoting *Harley-Davidson, Inc. v. Morris*, 19 F.3d 142, 148 (3d Cir. 1994)). "The court must discern the scope of a consent judgment by review of what is within the four corners of the consent, not by reference to what might satisfy the purposes of one of the parties to it." *Id.* "Under well settled rules of contract

interpretation, the Court should construe the contract as a whole to give effect to the parties' intentions, and where the contract language is clear and unambiguous, the Court ascertains the parties' intent by giving the language its ordinary and usual meaning." *Id*.

Consistent with such principles, however, the Bankruptcy Court evaluated the parties' differing readings of paragraph 44, and based on its ordinary and usual meaning, determined that HE's reading was the less sensible reading of the language. The Bankruptcy Court's observation that "courts are typically afforded substantial deference in construing their own orders" is uncontroversial, correct, and does not suggest that the Bankruptcy Court erred by ignoring paragraph 44's meaning simply to "satisfy the Buyer's purpose." D.I. 8 at 11.

## V.     CONCLUSION

For the reasons set forth above, the Enforcement Order will be affirmed. The Court will issue a separate Order consistent with this Memorandum Opinion.